**Nos. 2014-1139, 2014-1144**

# In the
# United States Court of Appeals
## for the Federal Circuit

ARIOSA DIAGNOSTICS, INC. and NATERA, INC.,

*Plaintiffs-Appellees,*

and

DNA DIAGNOSTICS CENTER, INC.,

*Counterclaim Defendant-Appellee,*

v.

SEQUENOM, INC. and SEQUENOM CENTER FOR MOLECULAR MEDICINE, LLC,

*Defendants-Appellants,*

and

ISIS INNOVATION LIMITED,

*Defendant.*

Appeals from the United States District Court for the Northern
District of California, Case Nos. 3:11-cv-06391-SI, 3:12-cv-00132-SI.
The Honorable **Susan Illston**, Judge Presiding.

## BRIEF OF *AMICUS CURIAE* TWENTY-THREE LAW PROFESSORS IN SUPPORT OF APPELLANTS' PETITION FOR REHEARING *EN BANC*

ADAM MOSSOFF
GEORGE MASON UNIVERSITY SCHOOL OF
LAW
3301 Fairfax Drive
Arlington, VA 22201
Tel: (703) 993-9577

*Professor of Law*

KEVIN E. NOONAN
MCDONNELL BOEHNEN HULBERT &
BERGHOFF LLP
300 South Wacker Drive, Suite 3100
Chicago, IL 60606
Tel: (312) 913-0001

*Counsel of Record for Amicus Curiae,
Twenty-Three Law Professors*

*A full list of the Amici is included at the end of the brief.*



# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 28(a)(1) and 47.4(a), counsel for *amicus curiae* state the following:

1. The full names of every party or *amicus* represented by us is:

      Twenty-Three Law Professors Specializing in Patent Law and Policy

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

      Not applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by us is:

      None.

4. The names of all law firms and the partners or associates that appeared for any of the parties or *amicus* now represented by us in the trial court or agency or in a prior proceeding in this case or are expected to appear in this Court are:

Kevin E. Noonan of McDonnell Boehnen Hulbert & Berghoff LLP


Dated: August 27, 2015      /s/ Kevin E. Noonan
                                Kevin E. Noonan
                                McDonnell Boehnen
                                      Hulbert & Berghoff LLP
                                300 South Wacker Drive
                                Chicago, IL 60606

# TABLE OF CONTENTS

**PAGE**

INTEREST OF AMICUS CURIAE ........................................................................1

SUMMARY OF ARGUMENT ............................................................................1

ARGUMENT .......................................................................................................2

   I.   The Panel Decision Undermines Twenty-First-Century Innovation
      That The Patent System Is Designed To Promote and Protect........................2

  II.  The Panel's Analysis Contradicts § 101 Jurisprudence As Evidenced
      By How It Cast Doubts on Validity of Classic Method Patents......................4

CONCLUSION ..................................................................................................10

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Ariosa Diagnostics, Inc. v. Sequenom Inc.*,
    788 F.3d 1371 (Fed. Cir. 2015) ................................................................1, 6

*Bilski v. Kappos*,
    561 U.S. 593 (2010).........................................................................1, 2, 5, 10

*Dolbear v. American Bell Telephone Company*,
    126 U.S. 1 (1888)...............................................................................7

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
    132 S. Ct. 1289 (2012)........................................................................5

*O'Reilly v. Morse*,
    56 U.S. 62 (1853)............................................................................5, 6

*Wisconsin v. Pelican Ins. Co.,*
    127 U.S. 265 (1888)..........................................................................9

**STATUTES**

U.S. Const. art. 1, § 8 , cl. 8 ..................................................................2

**OTHER AUTHORITIES**

Accelerate Diagnostics, *2014 Annual Report* (2015), available at http://ir.ax
    dx.com/secfiling.cfm?filingID=1000096-15-20&CIK=727207 ....................4

Christopher Beauchamp, Invented by Law: Alexander Graham Bell and
    the Patent That Changed America (2014)...............................................8

Justin Hughes, *Copyright and Incomplete Historiographies: Of Piracy,*
    *Propertization, and Thomas Jefferson*, 79 S. Cal. L. Rev. 993 (2006)..........9

i

Neal Katyal & Paul Clement, *On the Meaning of "Natural Born Citizen,"* 128
    HARV. L. REV. F. 161 (2015) .......................................................................9

Adam Mossoff, *O'Reilly v. Morse* (Aug. 18, 2014), available at
    http://ssrn.com/abstract=2448363. ..............................................................7

Adam Mossoff, *Who Cares What Thomas Jefferson Thought About Patents?
    Reevaluating the Patent "Privilege" in Historical Context*, 92 CORNELL L.
    REV. 93 (2007)..............................................................................................9

*Mystery Solved! What is the cost to develop and launch a Diagnostic?*, Diaceutics
    Group, http://www.diaceutics.com/mystery-solved-what-cost-develop-and-
    launch-diagnostic (last visited Aug. 18, 2015).............................................3

Henry M. Payntor, *The First Patent* (rev., 1998), available at
    http://www.me.utexas.edu/~longoria/paynter/hmp/The_First_Patent.html....8

Michael Risch, *Nothing is Patentable*, FLORIDA L. REV. F. (2015),
    available at http://ssrn.com/abstract=2642361 .............................................5

Roche, *Annual Report 2014,* (2015), available at
    http://www.roche.com/gb14e.pdf. ..................................................................3

THE IMPORTANCE OF DIAGNOSTICS, http://www.biomerieux.com/en/importance-
    diagnostics (last visited Aug. 18, 2015). ......................................................3

U.S. Patent No. X00001 (issued July 31, 1790) ...................................................5, 8

U.S. Reissue Patent No. 117 (issued June 13, 1848)...........................................6, 7

U.S. Patent No. 174,465 (issued Mar. 7, 1876) .....................................................7

## INTEREST OF THE AMICUS CURIAE[1]

The *amicus curiae* are twenty-three law professors who teach and write on patent law and policy, and are thus concerned with the integrity of the legal system that secures innovation to its creators and to the companies that commercialize it in the marketplace. Although *amici* may differ amongst themselves on other aspects of modern patent law and policy, they are united in their professional opinion that this court should grant rehearing *en banc* because the panel decision's application of § 101 undermines the function of the patent system to promote and to legally secure twenty-first-century innovation. They have no stake in the parties or in the outcome of the case.

## SUMMARY OF ARGUMENT

The panel decision exceeded the scope of the Supreme Court's § 101 jurisprudence in distinguishing patents claiming laws of nature, natural phenomena, and abstract ideas from patents claiming patent-eligible applications of those concepts.[2] As the Supreme Court recognized in *Bilski v. Kappos*, 561 U.S. 591 (2010), Section 101 is a "dynamic provision designed to encompass new and

---

[1] No party's counsel authored this brief in whole or part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person other than amici, their members, or counsel contributed money intended to fund preparing or submitting the brief. Fed. R. App. P. 29(c)(5). The authority under which this brief is filed comes from the contemporaneously filed motion for leave to file this brief in support of Appellants' Petition For Rehearing *En Banc*.

[2] *Ariosa Diagnostics, Inc. v. Sequenom, Inc*., 788 F.3d 1371 (Fed. Cir. 2015).

1

unforeseen inventions." *Id.* at 605. Since the parties and other *amici* address the legal infirmities and technological errors in the panel's decision, *amici* here offer two further insights as to how the panel decision undermines the essential function of the patent system in promoting new innovation. First, development and commercialization of prenatal genetic diagnostic tests is exactly the type of twenty-first-century innovation the patent system is designed to promote as a historically "unforeseen invention." *Id.* at 605. Second, the panel's analysis is not even "a sufficient basis for evaluating processes similar to those in the Industrial Revolution," because if applied consistently it would call into question nineteenth-century patented innovation the Supreme Court deemed valid. *Id.* at 605.

## ARGUMENT

### I.  The Panel Decision Undermines Twenty-First-Century Innovation That The Patent System Is Designed To Promote And Protect

The panel's decision contravenes the *Bilski* Court's injunction that § 101 tests should not impede the progress of future innovation. The massive research and development into new technological applications of genetic diagnostic testing methods exemplifies the "progress of . . . useful Arts" the patent system is intended to promote and secure to its creators.[3]

---

[3] U.S. CONST. art. 1, § 8, cl. 8.

As the close relationship between genetic variation (and mutational injury) and disease has become more clear as a result of massive research and development (R&D) expenditures, the value of genetic diagnostic tools has increased exponentially. Experts now estimate that 60-70% of all medical treatment decisions are based on the results of diagnostic tests.[4] Such tests have immense benefits for patient care and greatly reduce associated costs (including decreasing hospitalization and avoiding unnecessary treatment).[5]

The economics of innovative diagnostic tests reflect exactly the economic justification for the patent system: the cost of applying a genetic diagnostic test is relatively low, but the *ex ante* R&D cost is enormous and is not reflected in the marginal cost of the medical test itself. According to one study, the average cost to develop and commercialize a diagnostic testing technology in the United States is between $50-75 million and can exceed $100 million for developing and commercializing novel diagnostic technologies.[6] Screening for diseases with complex genetic interactions, like diabetes, heart disease, and cancer, require even greater investments. As the *Bilski* Court recognized, the patent system exists to

---

[4] THE IMPORTANCE OF DIAGNOSTICS, http://www.biomerieux.com/en/importance-diagnostics (last visited Aug. 18, 2015).

[5] Roche, *Annual Report 2014*, 33 (2015), available at http://www.roche.com/gb14e.pdf.

[6] *Mystery Solved! What is the cost to develop and launch a Diagnostic?*, Diaceutics Group, http://www.diaceutics.com/mystery-solved-what-cost-develop-and-launch-diagnostic (last visited Aug. 18, 2015).

promote new inventions on the frontier of human technological knowledge like genetic testing methods, which by necessity require massive R&D expenditures that can only be recouped via the protections offered by property rights in this innovation.

The panel decision contravenes this insight by the Supreme Court because it threatens to preclude many genetic and other diagnostic tests from the ambit of patent protection. It disincentivizes making the massive R&D investments required to create this new innovation in the twenty-first century. This is neither hyperbole nor conjecture. For example, Accelerate Diagnostics recently warned its investors that it "incurred significant costs in connection with the development and commercialization of [its] [diagnostic testing] technology" and "[i]f we are unable to effectively protect our . . . intellectual property, our business would be harmed."[7]

## II. The Panel's Analysis Contradicts § 101 Jurisprudence As Evidenced By How It Cast Doubts on Validity of Classic Method Patents

In *Mayo Collaborative Services v. Prometheus Laboratories*, the Supreme Court recognized that "too broad an interpretation of this exclusionary principle [regarding laws of nature, natural phenomena and abstract ideas] could eviscerate patent law. For all inventions at some level embody, use, reflect, rest upon, or

---

[7] Accelerate Diagnostics, *2014 Annual Report*, 23 (2015), available at http://ir.axdx.com/secfiling.cfm?filingID=1000096-15-20&CIK=727207.

apply laws of nature, natural phenomena, or abstract ideas."[8] Reflecting similar concerns, the *Bilski* Court rejected a § 101 test developed for assessing nineteenth-century process patents because it failed in properly "determining the patentability of inventions in the Information Age" today.[9]

These admonitions by the Supreme Court directly apply to this case, because not only does the panel decision threaten an entire field of twenty-first-century inventive activity, it would also cast serious doubt about classic nineteenth-century patented innovation either validly issued under the patent laws or sustained by the Supreme Court. There are too many historical patents and Supreme Court decisions to discuss them all within the constraints of this brief,[10] and thus we will identify only a few exemplars, including the first patent issued in 1790 on a method for making potash.[11]

Many judges and scholars cite to *O'Reilly v. Morse*, 56 U.S. 62 (1853), because the Supreme Court famously invalidated Claim 8 of Morse's patent, but many today may not remember that the *Morse* Court explicitly affirmed the

---

[8] *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. ___, 132 S. Ct. 1289, 1293 (2012).

[9] *Bilski*, 561 U.S. at 605.  The Court further warned that "[a] categorical rule denying patent protection for 'inventions in areas not contemplated by Congress . . . would frustrate the purposes of the patent law." *Id.* (citing *Diamond v. Chakrabarty*, 447, U.S. 303, 315 (1980)).

[10] *See* Michael Risch, *Nothing is Patentable*, FLORIDA L. REV. F. (2015), available at http://ssrn.com/abstract=2642361 (noting classic patents called into doubt).

[11] U.S. Patent No. X00001 (issued July 31, 1790).

validity of the first seven claims in Morse's patent.[12] This is important, because Claim 1 recited a method of operating an electro-magnetic telegraph that could be invalid under the panel's application of *Mayo*. Claim 1 is not quoted in Chief Justice Roger Taney's opinion in *Morse*, and so to understand this point, it is necessary to quote the relevant language from the claim:

> First. . . . what I specially claim as my invention and improvement, is making use of the motive power of magnetism, when developed by the action of such current or currents substantially as set forth in the foregoing description of the first principal part of my invention, as means of operating or giving motion to machinery which may be used to imprint signals upon paper or other suitable material, or to produce sounds in any desired manner, for the purpose of telegraphic communication at any distances.[13]

Under the panel's interpretation of step one of the *Mayo* test, this claim begins with patent ineligible natural phenomenon ("the motive power of magnetism") and ends with an abstract idea ("communication at any distances").

According to the panel, the second step in the *Mayo* test then requires assessing whether the claim also recites merely "well-understood, routine, and conventional activity,"[14] and each remaining element in Morse's Claim 1 recites conventional activity for the art in his time. First, Morse acknowledges in his specification that "it had been essayed to use the currents of electricity or

---

[12] *See Morse*, 56 U.S. at 112 ("We perceive no well-founded objection . . . to his right to a patent for the first seven inventions set forth in the specification of his claims.").

[13] U.S. Reissue Patent No. 117 (issued June 13, 1848).

[14] *Ariosa,* 788 F.3d at 1377.

galvanism for telegraphic purposes" before his invention, and he even acknowledges later in Claim 1 that "[t]here are various known methods of producing motion by electro-magnetism."[15] Second, the steps he states in Claim 1 of "operating or giving motion to machinery," "imprinting signals upon paper or other suitable material," and "produc[ing] sounds," when assessed individually were undeniably routine and conventional in the 1830s when Morse invented his electro-magnetic telegraph.[16] Accordingly, the *Ariosa* panel's application of the *Mayo* test, if applied to Claim 1 of Morse's patent in the same way the panel applied it to Sequenom's patent, leads to the conclusion that Morse's Claim 1 is arguably unpatentable subject matter. But this directly contradicts the Supreme Court's analysis and decision in *Morse* that Claim 1 is valid.

Another prominent and more commonly cited example of a patentable invention is Claim 5 of Alexander Graham Bell's patent on the telephone,[17] which was affirmed by the Supreme Court in *Dolbear v. American Bell Telephone Company*, 126 U.S. 1 (1888). Claim 5 recites:

> The method of and apparatus for transmitting vocal or other sounds telegraphically . . . by causing electrical undulations, similar in form to the vibrations of the air accompanying the said vocal or other sounds.

---

[15] U.S. Reissue Patent No. 117 (issued June 13, 1848).

[16] For an historical analysis of the invention, patenting, commercialization and litigation of Morse's electro-magnetic telegraph, *see* Adam Mossoff, *O'Reilly v. Morse* (Aug. 18, 2014), available at http://ssrn.com/abstract=2448363.

[17] U.S. Patent No. 174,465 (issued Mar. 7, 1876).

Again, applying the *Ariosa* panel's analysis to Claim 5 in Bell's patent leads to the same conclusion reached for Claim 1 of Morse's patent. First, under *Mayo* step one, Claim 5 begins and ends with "vocal and other sounds," and concerns generally the mere transmission of those sounds by electrical undulations. These concepts are natural phenomena, and thus are patent ineligible *per se*. The claim also does not recite anything significantly more than the ineligible concepts themselves that was not routine, well-understood and conventional, because telegraphic transmission and electrical undulation had been long known in the art.[18] Again, contrary to the Supreme Court's own analysis and decision in 1888, the *Ariosa* panel's analysis leads to the logical conclusion that Bell's famous Claim 5 is unpatentable subject matter.

Perhaps most surprising is that the first U.S. patent ever granted would be invalid under the panel's application of the *Mayo* two-step test. The first patent issued in 1790 to Samuel Hopkins for his method of making potash.[19] This method involved well-known steps such as burning and dissolving ash, and Hopkins' "inventive" contribution was in the timing and specific order of the steps.[20] Both of

---

[18] *See* CHRISTOPHER BEAUCHAMP, INVENTED BY LAW: ALEXANDER GRAHAM BELL AND THE PATENT THAT CHANGED AMERICA 58-85 (2014) (recounting claims of many prior and existing uses of electrical currents in telegraphic communication).
[19] U.S. Patent No. X00001 (granted July 31, 1790).
[20] *See* Henry M. Payntor, *The First Patent* (rev., 1998), available at http://www.me.utexas.edu/~longoria/paynter/hmp/The_First_Patent.html.

these aspects of Hopkins' patent considered individually would be deemed basic facts or concepts of conventional human activity, and under the *Ariosa* panel's application of the *Mayo* test are arguably unpatentable subject matter.

This is significant because Hopkins' patent was signed by Thomas Jefferson as Secretary of State and as a member of the committee created under the 1790 Patent Act who reviewed Hopkins' application. Jefferson was both a drafter of some of the early patent laws and has long been known for his views that patents should be severely restricted in their issuance to inventors.[21] Moreover, Hopkins' patent was issued under the 1790 Patent Act, which was drafted by many of the original Framers of the Constitution who were then serving in Congress. Justices and constitutional scholars recognize legislation from the First Congress as having significant import as to the meaning of the Constitution.[22] This includes the Copyright and Patent Clause's authorization for Congress to secure an "exclusive

---

[21] *See* Adam Mossoff, *Who Cares What Thomas Jefferson Thought About Patents? Reevaluating the Patent "Privilege" in Historical Context*, 92 CORNELL L. REV. 93, 959-63 (2007); *see also* Justin Hughes, *Copyright and Incomplete Historiographies: Of Piracy, Propertization, and Thomas Jefferson*, 79 S. CAL. L. REV. 993, 1026-34 (2006) (discussing Jefferson's contradictory views on the legitimacy of patents and copyrights).

[22] *See, e.g., Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888) (quoting 1789 Judiciary Act as primary evidence of meaning of Article III, § 2); Neal Katyal & Paul Clement, *On the Meaning of "Natural Born Citizen,"* 128 HARV. L. REV. F. 161, 161 (2015) ("The Supreme Court has long recognized that two particularly useful sources in understanding constitutional terms are British common law and enactments of the First Congress.").

Right" to "Inventors" for their "Discoveries" in order to advance the "progress of . . . useful Arts." Thus, when a contemporary court reaches a decision that calls into question a patent validly issued under the 1790 Patent Act and signed by Jefferson himself, it is cause to question whether this court has applied the law correctly.

As has been made clear, the panel decision not only contradicts the *Bilski* Court's injunction that § 101 is a "dynamic provision designed to encompass new and unforeseen inventions," *Bilski,* 561 U.S. at 605, such as the revolutionary genetic diagnostic testing methods made possible by the modern biotech revolution, it also casts doubt on classic patented innovation validly issued or upheld by the Supreme Court. This suggests that the *Ariosa* panel has misapplied § 101 jurisprudence and that the error is significant enough to warrant *en banc* consideration.

## CONCLUSION

*Amici* urge this court to grant rehearing of this matter *en banc* and reverse the panel decision.

Respectfully submitted,

/s/Kevin E. Noonan
Kevin E. Noonan
McDonnell Boehnen
     Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, IL 60606
(312) 913-0001
*Counsel for Amicus Curiae*

10

*Full List of Amici Curiae:*

Dan L. Burk
Chancellor's Professor of Law
University of California, Irvine School of Law

Bernard Chao
Associate Professor
University of Denver Sturm College of Law

Ralph D. Clifford
Professor of Law
University of Massachusetts School of Law

Christopher A. Cotropia
Professor of Law
University of Richmond School of Law

Gregory Dolin
Associate Professor of Law
University of Baltimore School of Law

Richard A. Epstein
Laurence A. Tisch Professor of Law
New York University School of Law

Christopher Frerking
Professor of Law
University of New Hampshire School of Law

Yaniv Heled
Assistant Professor of Law
Georgia State University College of Law

Timothy Holbrook
Professor of Law
Emory University School of Law

Christopher M. Holman
Professor of Law
UMKC School of Law

Gus Hurwitz
Assistant Professor of Law
Nebraska College of Law

Mark D. Janis
Robert A. Lucas Chair of Law
Indiana University Bloomington Maurer School of Law

Adam Mossoff
Professor of Law
George Mason University School of Law

Sean M. O'Connor
Boeing International Professor
University of Washington School of Law

Kristen Osenga
Professor of Law
University of Richmond School of Law

Lee Petherbridge
Professor of Law
Loyola Law School

Michael Risch
Professor of Law
Villanova University School of Law

Mark F. Schultz
Associate Professor of Law
Southern Illinois University School of Law

Sean B. Seymore
FedEx Research Professor of Law
Vanderbilt University Law School

12

Ted Sichelman
Professor of Law
University of San Diego School of Law

Brenda M. Simon
Associate Professor of Law
Thomas Jefferson School of Law

Shine Tu
Associate Professor of Law
West Virginia University College of Law

Saurabh Vishnubhakat
Associate Professor of Law
Texas A&M University School of Law

## CERTIFICATE OF COMPLIANCE

This brief complies with the page limitation of Fed. Cir. R. App. P. 35(g), as it does not exceed 10 pages.

The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 in 14-point Times New Roman type.

## <u>CERTIFICATE OF SERVICE</u>

I, Gary Y. Chyi, being duly sworn according to law and being over the age of 18, upon my oath deposes and states that:

Counsel Press was retained by Kevin E. Noonan, McDonnell Boehnen Hulbert & Berghoff LLP, Attorneys for *Amicus Curiae* Twenty-Three Law Professors, to print this document. I am an employee of Counsel Press.

On August 27, 2015, Mr. Noonan authorized me to electronically file the foregoing Brief of *Amicus* Curiae Twenty-Three Law Professors In Support of Appellants' Petition for Rehearing *En* Banc with the Clerk of the Federal Circuit using the CM/ECF System, which will serve e-mail notice of such filing on the following:

David I. Gindler
(*Principal Counsel*)
Andrei Iancu
Amir Naini
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
310-277-1010
dgindler@irell.com
aiancu@irell.com
anaini@raklaw.com
*Counsel for Appellee*
*Ariosa Diagnostics, Inc.*

William P. Schuck
(*Principal Counsel*)
Bartko, Zankel, Bunzel & Miller
One Embarcadero Center
Suite 800
San Francisco, CA 94111
415-956-1900
pschuck@bzbm.com
*Counsel for Appellees*
*Natera, Inc., et al.*

Thomas C. Goldstein
Eric F. Citron
GOLDSTEIN & RUSSELL, PC
7475 Wisconsin Avenue, Suite 850
Bethesda, MD 20814
(202) 362-0636
tg@goldsteinrussell.com
ecitron@goldsteinrussell.com
*Counsel for Appellants Sequenom, Inc. et al.*

Additionally, paper copies will also be mailed to the above counsel for the parties at the time paper copies are sent to the Court.

Sixteen paper copies will be filed with the Court within the time provided in the Court's rules.

/s/  Gary Y. Chyi
Gary Y. Chyi

August 27, 2015