2014-1139, -1144

# United States Court of Appeals
# for the Federal Circuit

ARIOSA DIAGNOSTICS, INC., and NATERA, INC.,

*Plaintiffs-Appellees,*

and

DNA DIAGNOSTICS CENTER, INC.,

*Counterclaim Defendant-Appellee,*

v.

SEQUENOM, INC., and
SEQUENOM CENTER FOR MOLECULAR MEDICINE, LLC,

*Defendants-Appellants,*

and

ISIS INNOVATION LIMITED,

*Defendant.*

*Appeals from the United States District Court for the Northern District of California in Nos. 3:11-cv-06391-SI,3:12-cv-00132-SI, Judge Susan Y. Illston.*

**BRIEF OF THE BIOINDUSTRY ASSOCIATION AS *AMICUS CURIAE* SUPPORTING PETITION FOR REHEARING *EN BANC***

Konstantin M. Linnik
Lana A. Gladstein
Isaac A. Hubner
NUTTER MCCLENNEN
    & FISH LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 439-2000
Facsimile: (617) 310-9000
*Counsel for Amicus Curiae*

August 27, 2015

# United States Court of Appeals
## for the Federal Circuit
### *Ariosa Diagnostics, Inc v. Sequenom, Inc.*
### Nos. 2014-1139, -1144

## CERTIFICATE OF INTEREST

Counsel for the *Amicus Curiae*, BioIndustry Association, certifies the following:

1.  The full name of every party or amicus represented by us is:

    BioIndustry Association ("BIA")

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

    Not applicable

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    None

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    Before this Court, BIA is represented by Nutter McClennen & Fish LLP (Konstantin Linnik, Lana A. Gladstein, and Isaac Hubner), 155 Seaport Boulevard, Boston, MA 02210.


Dated:  August 27, 2015                    /s/ Konstantin M. Linnik
                                           Konstantin M. Linnik
                                           *Counsel for Amicus Curiae*
                                           *BioIndustry Association*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST........................................................................i

TABLE OF CONTENTS..................................................................................ii

TABLE OF AUTHORITIES.............................................................................iii

TABLE OF ABBREVIATIONS.........................................................................v

I.    STATEMENT OF INTEREST OF *AMICUS CURIAE*...............................................................................1

II.   REASONS FOR GRANTING REHEARING *EN BANC*..........................2

    A. The Panel Decision Is at Odds With Accepted Patent-Eligibility Standards.................................................................................3

    B. The Panel Decision Frustrates Long-Term Harmonization Efforts.....................................................................................6

    C. Trade Secret Protection is Not a Viable Option for Foreign and Multinational Companies..........................................................9

III.  CONCLUSION..................................................................................10

CERTIFICATE OF COMPLIANCE

ADDENDUM A (*Decision of the Boards of Appeal of The EPO,* Case No. T 0146/07 - 3.3.08 (December 13, 2011))

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Association for Molecular Pathology v. Myriad Genetics,*
133 S. Ct. 2107 (2013) ...................................................................................3

*Mayo v. Prometheus Laboratories,*
132 S. Ct. 1289 (2012) ................................................................................3, 4

## STATUTES

*U.S. Const. art. I, § 8* ........................................................................................8

35 U.S.C. § 101 ....................................................................................................8

35 U.S.C. §122 (a)(2)(B)(i) ...............................................................................10

PL112-29, September 16, 2011, 125 Stat. 284, Sec. 33 ...............................8, 9

## OTHER AUTHORITIES

Evaluate Pharma, *Pharmaceutical & Biotech Sales Analysis by Country,* May 2014,
http://info.evaluategroup.com/rs/evaluatepharmaltd/images/EvaluatePharma%20-%20Pharmaceutical%20%26%20Biotech%20Sales%20Analysis%20by%20Country%20-%20Report.pdf ..............................................................................2

*U.S. Patent Statistics, Calendar Years 1963-2014*
http://www.uspto.gov/web/offices/ac/ido/oeip/taf/us_stat.pdf ...........................2

UK Patent Act 1977, Section 1(2)(a),
http://www.legislation.gov.uk/ukpga/1977/37 ..............................................4

Articles 52(2) and 53(c) of the European Patent Convention,
http://documents.epo.org/projects/babylon/eponet.nsf/0/00E0CD7FD461C0D5C1257C060050C376/$File/EPC_15th_edition_2013.pdf ...........................4

G2/88, OJ 1990, 93, http://archive.epo.org/epo/pubs/oj1990/p093_185.pdf ...........5

*EPO Guidelines for Examination* http://www.epo.org/law-practice/legal-texts/html/guidelines/e/g_ii_3_1.htm ..........................................................6

*WIPO Summary of the Paris Convention for the Protection of Industrial Property*
    http://www.wipo.int/treaties/en/ip/paris/summary_paris.html ...........................7

*WIPO-Administered Treaties*
    http://www.wipo.int/treaties/en/ShowResults.jsp?lang=en&treaty_id=2.............7

*WIPO Convention Establishing the World Intellectual Property Organization*
    http://www.wipo.int/treaties/en/text.jsp?file_id=283854 ...........................8

*WIPO Member States* http://www.wipo.int/members/en/.................................................8

*WIPO-Administered Treaties* http://www.wipo.int/treaties/en/ .........................................8

*PCT – The International Patent System* http://www.wipo.int/pct/en/.................................8

*Summary of the Patent Cooperation Treaty (PCT) (1970)*
    http://www.wipo.int/treaties/en/registration/pct/summary_pct.html ..................8

*WTO Overview: the TRIPS Agreement*
    https://www.wto.org/english/tratop_e/trips_e/intel2_e.htm...................................8

*Members and Observers*
    https://www.wto.org/english/thewto_e/whatis_e/tif_e/org6_e.htm ....................8

*Harmonization: The Time is Now* http://www.uspto.gov/learning-and-
    resources/ip-policy/harmonization.................................................................9

## TABLE OF ABBREVIATIONS

| ABBREVIATION | MEANING |
|---|---|
| AIA | The America Invents Act of 2011 |
| EPO | European Patent Office |
| USPTO | United States Patent and Trademark Office |
| WIPO | World Intellectual Property Organization |
| WTO | World Trade Organization |

## I.    STATEMENT OF INTEREST OF *AMICUS CURIAE*

The BioIndustry Association ("BIA") is a United Kingdom trade association of over 300 member organizations working in research and development ("R&D") and manufacturing in the bioscience sector.[1] BIA members include emerging and established biotechnology companies, pharmaceutical companies, academic research and philanthropic organizations. BIA members are responsible for over ninety per cent of biotechnology-based medicines currently in clinical development in the UK; they are at the forefront of innovative scientific developments targeting areas of unmet medical need.

The issues raised in this case are of great importance to BIA. The majority of BIA's members are small and medium size enterprises. For these enterprises, the ability to raise R&D funding or attract larger companies to collaborate heavily depends on the strength of their intellectual property, primarily patents. Lack of patent protection severely hinders their ability to bring to life new and improved treatments and, in many cases, makes it impossible.

Many BIA members operate, or plan to operate, directly or indirectly in the United States, and thereby create jobs in the United States. Not surprisingly, startups and fledging businesses rely on the US market projections for securing R&D funding,

---

[1] BIA has no commercial interest in the parties to this action and none of the parties is a member of BIA. Pursuant to Fed. Cir. R. 35(g) BIA is contemporaneously filing a motion for leave to file this brief.

as the US accounts for 47% of the global biotechnology market.[2, 3] According to the USPTO, approximately 50% of all US patent applications are filed by foreign entities.[4]

BIA members believe that a strong, clear, and effective patent system is vital to innovation and healthcare not just in Europe and the US, but globally. BIA members are concerned that the panel decision, if left unchanged, jeopardizes the future of much-needed diagnostics and life-saving medicines.

## II.    REASONS FOR GRANTING REHEARING EN BANC

Harmonized, clear, and predictable regulatory and legal frameworks are essential for biomedical innovation. The panel's interpretation of the Supreme Court's precedent puts the US patentable subject matter eligibility standard at odds with those of other industrial nations. It is a setback in long-standing efforts to harmonize patents laws. Moreover, foreign and multinational companies would be additionally disadvantaged because, as a practical matter, in the absence of patent protection in the US, their inventions would not be protectable as trade secrets. These companies would be forced to choose between patent protection in the rest of the world (except the US) or trade secret protection everywhere. As a result, the unintended consequence of the *Sequenom* decision may be an exodus of investment and businesses

---

[2] Evaluate Pharma, *Pharmaceutical & Biotech Sales Analysis by Country,* May 2014, at 2 http://info.evaluategroup.com/rs/evaluatepharmaltd/images/EvaluatePharma%20-%20Pharmaceutical%20%26%20Biotech%20Sales%20Analysis%20by%20Country%20-%20Report.pdf
[3] All references to websites throughout this brief were last visited on August 24, 2015.
[4] *See U.S. Patent Statistics, Calendar Years 1963-2014* http://www.uspto.gov/web/offices/ac/ido/oeip/taf/us_stat.pdf

2

from the US market or the life science industry in general. For these reasons, the *amicus curiae,* BIA, respectfully urges the Court to review the panel decision *en banc.*

## A.    The Panel Decision Is at Odds With Accepted Patent-Eligibility Standards

The panel used the Supreme Court's two-step approach, enunciated in *Mayo v. Prometheus Laboratories*, 132 S. Ct. 1289 (2012), for determining whether Sequenom's claims are directed to patent-ineligible subject matter. Judge Linn characterized the panel's holding as an unintended consequence of *Mayo. See* Conc. Op. at 2. This Court is in the best position to build on the general framework outlined by the Supreme Court in *Mayo* and *Association for Molecular Pathology v. Myriad Genetics*, 133 S. Ct. 2107 (2013)*,* and to apply that framework to the unique facts presented in this case so as to avoid "unintended consequences."

The Supreme Court could not have intended a general exclusion denying patent protection to meritorious inventions merely because they are based on a discovery of something that occurs in nature. Unquestionably, *Mayo* and *Myriad* prescribe that patent protection is not available if the inventor "claims" a law of nature, a natural phenomenon, or an abstract idea. *See, e.g., Mayo*, 132 S. Ct. 1289, 1297 (2012). It is also clear that the claim language is not to be interpreted literally, instead, the Supreme Court instructs one to look at the substance of what the inventor attempts to claim. *Id.* One needs to determine whether the inventor has added "significantly more" to

3

the claims, "enough" to transform a patent-ineligible discovery into a patent-eligible application of that discovery. *Id.* at 1294.

It is critical, therefore, to delineate with clarity when a patent-ineligible discovery becomes sufficiently transformed. A sweeping interpretation requiring the inventor to come up with an "inventive concept" beyond a novel application of the discovery itself will lead to unfortunate results, as in the case here, where even an acknowledged ground-breaking meritorious invention is denied patent protection merely because it originates from a discovery of a natural phenomenon.

A direct comparison with other jurisdictions may be instructive. Similarly to the US, laws of nature and natural phenomena are not patentable in Europe,[5] yet patent-eligibility determinations for the same inventions result in drastically different outcomes there. It begs the question: "Does the problem lie with the analytical framework (or lack thereof) rather than the merits of the inventions?"

Consider European patent EP 994 963 ("EP '963"), the counterpart of Sequenom's US Patent 6,258,540 ("the '540 patent"). EP '963 was examined and

---

[5] Article 52(2) of the European Patent Convention states: "(2) The following in particular shall not be regarded as inventions…: (a) discoveries, scientific theories and mathematical methods..." While Art. 53(c) also excludes "methods for treatment of the human or animal body by surgery or therapy and diagnostic methods practised on the human or animal body," this exclusion does not apply to diagnostic methods practiced on samples *ex vivo*, such as Sequenom's method. *See* http://documents.epo.org/projects/babylon/eponet.nsf/0/00E0CD7FD461C0D5C1257C060050C376/$File/EPC_15th_edition_2013.pdf, at 110. Likewise, the UK patent statute excludes from the term invention "a discovery, scientific theory or mathematical method." *See* UK Patent Act 1977, Section 1(2)(a) at http://www.legislation.gov.uk/ukpga/1977/37.

granted by the EPO. As can be seen from the table below, European claim 4 of

Sequenom's EP '963 is substantially identical to US claim 1 of the '540 patent:

| EP '963 patent | US '540 patent |
|---|---|
| 1. A detection method performed on a maternal serum or plasma sample from a pregnant female, which method comprises<br><br>detecting the presence of a nucleic acid of foetal origin in the sample,<br><br>wherein said nucleic acid is a paternally inherited sequence which is not possessed by said pregnant female. | 1. A method for detecting a paternally inherited nucleic acid of fetal origin performed on a maternal serum or plasma sample from a pregnant female, which method comprises<br><br>amplifying a paternally inherited nucleic acid from the serum or plasma sample and<br><br>detecting the presence of a paternally inherited nucleic acid of fetal origin in the sample. |
| 4. A method according to [claim 1], wherein said detecting comprises amplifying said nucleic acid. | |

Notably, EP '963 was challenged, but survived a third-party opposition and an appeal

of that decision at the EPO. Subject-matter eligibility was not at issue, and the EPO

twice affirmed the claims as novel and inventive. *See Decision of the Boards of Appeal of*

*The EPO,* Case No. T 0146/07 - 3.3.08 (December 13, 2011) (attached hereto as

Addendum A).

    The EPO has long-recognized that when an idea or concept underlying the

claimed subject-matter resides in a discovery, it does not necessarily mean the claimed

subject-matter is a discovery as such.[6] The EPO Guidelines issued in 2012

differentiate a mere discovery from a practical application of that discovery as follows:

> *If a new property of a known material or article is found out, that is mere discovery and unpatentable* because discovery as such has no technical effect and is therefore not an invention within the meaning of Art. 52(1). *If, however, that property is put to practical use, then this constitutes an invention which may be patentable.* For example, the discovery that a particular known material is able to withstand mechanical shock would not be patentable, but a railway sleeper made from that material could well be patentable. To find a previously unrecognized substance occurring in nature is also mere discovery and therefore unpatentable. *However, if a substance found in nature can be shown to produce a technical effect, it may be patentable. An example of such a case is that of a substance occurring in nature which is found to have an antibiotic effect.*

*EPO Guidelines for Examination* http://www.epo.org/law-practice/legal-texts/html/guidelines/e/g_ii_3_1.htm (emphasis added). The opposite outcomes in the application of patent eligibility standards in the US and Europe, while not peculiar to the present case, reflect a fundamental difference in the two analytical approaches seemingly designed for the same purpose, to exclude "mere discoveries" from being patented. The "significantly more" requirement enunciated in *Mayo* and *Myriad* has no equivalent in the patent laws of other industrialized countries and, to be useful and instructive, requires a more developed analytical framework.

## B.    The Panel Decision Frustrates Long-Term Harmonization Efforts

The newly emerged disparity of patent eligibility standards frustrates decades-long efforts to harmonize IP laws across the world. Such efforts are rooted in

---

[6] G2/88, OJ 1990, 93, http://archive.epo.org/epo/pubs/oj1990/p093_185.pdf

international treaties and foundational to the United States' ongoing efforts to promote a modern innovation economy, consistent with the Constitutional directive "[t]o promote the Progress of Science and useful Arts." *U.S. Const.* art. I, § 8, cl. 8.

The long-term, global trend towards patent law harmonization extends back over 130 years to the 1883 Paris Convention for the Protection of Industrial Property. The Paris Convention, which now covers 176 member countries including the US, ensures equal national treatment and priority rights for applicants from all member countries.[7]

Following the Paris Convention, harmonization continued and expanded, resulting in numerous treaties and international organizations with essentially universal membership. For example, the WIPO (an agency of the United Nations) was created in 1967 "to encourage creative activity, to promote the protection of intellectual property throughout the world."[8] WIPO currently has 188 member states, administers 26 international treaties, including the Paris Convention and the 1970 Patent Cooperation Treaty (PCT), which provides a unified procedure for protecting inventions in each of its 148 contracting states.[9]

---

[7] *See WIPO Summary of the Paris Convention for the Protection of Industrial Property* http://www.wipo.int/treaties/en/ip/paris/summary_paris.html and *WIPO-Administered Treaties* http://www.wipo.int/treaties/en/ShowResults.jsp?lang=en&treaty_id=2.
[8] *WIPO Convention Establishing the World Intellectual Property Organization* http://www.wipo.int/treaties/en/text.jsp?file_id=283854.
[9] *See WIPO Member States* http://www.wipo.int/members/en/; *WIPO-Administered Treaties* http://www.wipo.int/treaties/en/; *PCT – The International Patent System*

Similarly, the 1995 Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS), which is administered by the WTO and covers all 161 WTO member countries, is notable for introducing IP law directly into international trade and for setting down minimum and uniform standards for many forms of intellectual property protection across the industrialized world.[10]

The panel decision in this case also appears to be fundamentally incompatible with recent major legislation in the United States. The AIA, passed in 2011, was conceived as a major step in the harmonization efforts and pre-dates *Mayo* and *Myriad*. The AIA was the most significant and far-reaching IP legislative initiative since the US Patent Act of 1952.

Notably, the AIA made no changes to § 101 and preserved the *status quo* on patent eligibility, except adding "a human organism" as an exclusion to patent-eligible subject matter.[11] As stated by the USPTO, the AIA "pave[d] the way for greater patent harmonization … to ensure consistency and clarity of rights to the world's innovators." *See Harmonization: The Time is Now,* http://www.uspto.gov/learning-and-

---

http://www.wipo.int/pct/en/; and *Summary of the Patent Cooperation Treaty (PCT) (1970)* http://www.wipo.int/treaties/en/registration/pct/summary_pct.html.
[10] *See WTO Overview: the TRIPS Agreement* https://www.wto.org/english/tratop_e/trips_e/intel2_e.htm and *Members and Observers* https://www.wto.org/english/thewto_e/whatis_e/tif_e/org6_e.htm.
[11] "LIMITATION ON ISSUANCE OF PATENTS.
   (a) LIMITATION.--Notwithstanding any other provision of law, no patent may issue on a claim directed to or encompassing a human organism."  PL112-29, September 16, 2011, 125 Stat. 284, Sec. 33.

resources/ip-policy/harmonization. This is not simply a legislative remit but an economic imperative.

> The USPTO further emphasized that:

> as innovators seek to tap into global markets, it is ***imperative*** that the international patent system provide consistent, cost effective avenues to obtain ***reliable patent rights in multiple jurisdictions***. The passage of the AIA enables the USPTO to lead on a vision of the IP world in which ***national and regional patent systems are harmonized in pursuit of creating an optimal environment for technological innovation and diffusion***.

*Id.* (emphasis added). Thus, the panel decision threatens the innovativeness and competitiveness of the US economy, and as such cannot be what international treaties, Congress, and the Supreme Court intended.

## C.    Trade Secret Protection is Not a Viable Option for Foreign and Multinational Companies

The interplay of patent eligibility standards in the United States and other jurisdictions, and its effect on the availability of trade secret protection should be given particular attention. The increasing globalization and the growing size of the biotechnology market (the US represents 47% of the biotechnology market, *see* Footnote 2 *supra*) demand that innovators protect their inventions throughout the world. In this environment, foreign and multinational companies are uniquely disadvantaged by the *Sequenom* decision.

Procuring a patent in Europe, for example, like in the US, comes at the cost of public disclosure of the invention in the patent application publication. As a result of

publication, trade secret protection is forfeited everywhere in the world. A US-only applicant may file a patent application with a request for non-publication,[12] and if unsuccessful in obtaining a patent, may pursue protection via trade secrets. Foreign entities, on the other hand, do not have that option because such non-publication exception does not exist outside the US. Thus, if they obtain patents in their respective countries, but are refused a patent in the US, they will have neither patent nor trade secret protection in the US. Therefore, a consequence of the panel's decision in *Sequenom* is the *de facto* abolition of intellectual property protection in the United States for many foreign and multinational companies who were able to procure patents abroad.

Such an outcome is particularly troubling in the case of meritorious, life-saving inventions. The resulting lack of both patent and trade secret protection will drive investments away from the US market and will impede investment in the biotechnology industry as a whole.

## III. CONCLUSION

For the foregoing reasons, BIA respectfully urges the Court to review the panel decision *en banc*.

---

[12] Under 35 U.S.C. § 122 (a)(2)(B)(i), "If an applicant makes a request upon filing, certifying that the invention disclosed in the application has not and will not be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication of applications 18 months after filing, the application shall not be published… ."

Respectfully submitted,

Dated:  August 27, 2015

/s/ Konstantin M. Linnik
Konstantin M. Linnik
Lana A. Gladstein
Isaac A. Hubner
NUTTER MCCLENNEN
                 & FISH LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 439-2000
Facsimile: (617) 310-9000
*Counsel for Amicus Curiae*

**ADDENDUM A**

BESCHWERDEKAMMERN      BOARDS OF APPEAL OF    CHAMBRES DE RECOURS
DES EUROPÄISCHEN       THE EUROPEAN PATENT    DE L'OFFICE EUROPEEN
PATENTAMTS             OFFICE                 DES BREVETS


**Internal distribution code:**
(A) [ ] Publication in OJ
(B) [ ] To Chairmen and Members
(C) [X] To Chairmen
(D) [ ] No distribution


## Datasheet for the decision
## of 13 December 2011


**Case Number:**                  T 0146/07 - 3.3.08

**Application Number:**            98910845.1

**Publication Number:**            0994963

**IPC:**                           C12Q 1/68

**Language of the proceedings:**   EN

**Title of invention:**
Non-invasive prenatal diagnosis

**Patentee:**
ISIS INNOVATION LIMITED

**Opponent:**
Ravgen Inc.

**Headword:**
Prenatal diagnosis/ISIS

**Relevant legal provisions:**
EPC Art. 56, 83, 87, 115
EPC R. 50(3), 86, 114(1)

**Relevant legal provisions (EPC 1973):**
-

**Keyword:**
"Anonymous third party observations (deemed not to have been
filed)"
"Sufficiency of disclosure (yes)"
"Priority (valid)"
"Inventive step (yes)"

**Decisions cited:**
G 0002/98, G 0001/03, G 0002/03, T 0735/04

**Catchword:**
See points 3 to 6 of the Reasons



| | | |
|---|---|---|
| **Europäisches**<br>**Patentamt** | **European**<br>**Patent Office** | **Office européen**<br>**des brevets** |
| Beschwerdekammern | Boards of Appeal | Chambres de recours |

**Case Number:** T 0146/07 - 3.3.08

# D E C I S I O N
## of the Technical Board of Appeal 3.3.08
## of 13 December 2011

**Appellant:**
(Opponent)

Ravgen Inc.
9241 Rumsey Road
Columbia, MD 21045   (US)

**Representative:**

Brasnett, Adrian Hugh
Mewburn Ellis LLP
33 Gutter Lane
London EC2V 8AS   (GB)

**Respondent:**
(Patent Proprietor)

ISIS INNOVATION LIMITED
Ewert House
Ewert Place
Summertown
Oxford OX2 7SG   (GB)

**Representative:**

Roques, Sarah Elizabeth
J.A. Kemp & Co.
14 South Square
Gray's Inn
London WC1R 5JJ   (GB)

**Decision under appeal:**

**Interlocutory decision of the Opposition Division of the European Patent Office posted on 19 December 2006 concerning maintenance of European patent No. 0994963 in amended form.**

**Composition of the Board:**

**Chairman:**   R. Moufang
**Members:**    M. R. Vega Laso
              T. J. H. Mennessier

C6855.D

**Summary of Facts and Submissions**

I.      European patent No. 0 994 963 with the title "Non-
        invasive prenatal diagnosis" was granted on European
        patent application No. 98910845.1 (published as
        WO 98/039474).

II.     The patent, which was granted with 21 claims, was
        opposed on the grounds for opposition mentioned in
        Article 100(a) and (b) EPC 1973, in particular that the
        claimed subject-matter lacked an inventive step
        (Article 56 EPC 1973), and that the claimed invention
        was not sufficiently disclosed in the patent. In
        connection with the objection of lack of inventive step,
        the opponent questioned the validity of the priority in
        respect of the invention in claims 1 and 15 to 19.

III.    In an interlocutory decision under Articles 102(3) and
        106(3) EPC 1973 posted on 19 December 2006, the
        opposition division decided that the invention in
        claim 1 of the main request (claims 1 to 20 filed with
        letter of 19 July 2006 as auxiliary request 1) had not
        been sufficiently disclosed, contrary to
        Article 83 EPC 1973. However, the amended claims
        according to auxiliary request 1 (claims 1 to 19 filed
        at the oral proceedings before the opposition division)
        and the invention to which they related, were
        considered to fulfil all requirements of the EPC. The
        opposition division thus decided that the patent could
        be maintained on the basis of these claims and an
        adapted description filed also at the oral proceedings.

IV.     Independent claim 1 and dependent claims 14 to 17
        according to auxiliary request 1 read:

"1. A detection method performed on a maternal serum or plasma sample from a pregnant female, which method comprises detecting the presence of a nucleic acid of foetal origin in the sample, wherein said nucleic acid is a paternally inherited sequence which is not possessed by said pregnant female.

14. A method according to claim 12 or 13, for the detection of a maternal or foetal condition in which the level of foetal DNA in the maternal serum or plasma is higher or lower than normal.

15. A method according to claim 14, for the detection of pre-eclampsia.

16. A method according to claim 14, for the detection of a foetal chromosomal aneuploidy.

17. A method according to claim 16, wherein said foetal chromosomal aneuploidy is Down's syndrome."

Dependent claims 2 to 13 concerned various embodiments of the method of claim 1. Claims 18 and 19 related to a method of performing a prenatal diagnosis, using the method of any one of claims 1 to 17.

V.    The opponent (appellant) lodged an appeal against the interlocutory decision of the opposition division and requested the revocation of the patent. As a subsidiary request, oral proceedings were requested. Together with the statement of grounds of appeal, the appellant filed a consolidated list of documents and additional documentary evidence.

C6855.D

VI.     The proprietor (respondent) submitted observations on
        the grounds of appeal and requested, *inter alia*, oral
        proceedings.

VII.    The parties were summoned to oral proceedings on
        20 January 2011. In a communication pursuant to
        Article 15(1) of the Rules of Procedure of the Boards
        of Appeal (RPBA), the board expressed its provisional
        opinion on some of the issues to be discussed during
        the oral proceedings, in particular issues concerning
        sufficiency of disclosure (Article 83 EPC), priority
        (Article 87 EPC 1973) and inventive step
        (Article 56 EPC 1973).

VIII.   The appellant informed the board that it would not be
        represented at the scheduled oral proceedings, and
        withdrew its request for oral proceedings. The
        respondent filed a reply to the board's communication
        and put forward arguments supporting an inventive step,
        in particular with regard to a combination of
        documents (14) and (15).

IX.     On 10 January 2011, the parties were informed by
        telefax that the board had decided to cancel the oral
        proceedings and take a decision on the basis of the
        written submissions.

X.      On 18 January 2011, observations by an anonymous third
        party were received. A copy of the observations was
        forwarded to the respondent under Rule 114(2) EPC.

XI.     On 24 February 2011, the respondent submitted comments
        on the anonymous observations.

XII.   In the present decision, the board refers to the
       following documents:

       (1):  Douglas et al., November 1959, Am. J. Obst. &
             Gynec., Vol. 78, No. 5, pages 963 to 973;

       (2):  J. Walknowska et al., 7 June 1969, The Lancet,
             pages 1119 to 1122;

       (6):  L. Raptis and H. A. Menard, December 1980, J.
             Clin. Invest., Vol. 66, pages 1391 to 1399;

       (9):  S. Strickland and W. G. Richards, 30 October 1992,
             Cell, Vol. 71, pages 355 to 357;

       (10): M. Martin et al., 1992, Human Immunology, Vol. 33,
             pages 108 to 113;

       (11): S. L. Emanuel and S. Pestka, 1993, GATA, Vol. 10,
             No. 6, pages 144 to 146;

       (13): J. L. Simpson and S. Elias, 1994, Prenatal
             Diagnosis, Vol. 14, pages 1229 to 1242;

       (14): Y.-M. D. Lo et al., 1994, British Journal of
             Haematology, Vol. 87, pages 658 to 660;

       (15): K. R. Fowke et al., 1995, Journal of Immunological
             Methods, Vol. 180, pages 45 to 51;

       (17): H. E. Mulcahy et al., 7 September 1996, The Lancet,
             Vol. 348, page 628;

(19):Y. M. D. Lo et al., 16 August 1997, The Lancet,
     Vol. 350, pages 485 to 487;

(21):W. Holzgreve and S. Hahn, 2000, Baillière's
     Clinical Obstetrics and Gynaecology, Vol. 14,
     No. 4, pages 709 to 722;

(23):B. Pertl and D. W. Bianchi, September 2001,
     Obstetrics & Gynecology, Vol. 98, No. 3, pages 483
     to 490;

(26):B. M. Byrne et al., 2003, Hypertens Pregnancy,
     Vol. 22, No. 2, pages 157 to 164;

(30):Y. M. D. Lo et al., 1999, Clinical Chemistry,
     Vol. 45, No. 10, pages 1747 to 1751;

(31):Y. M. D. Lo et al., 1999, Clinical Chemistry,
     Vol. 45, No. 2, pages 184 to 188.

XIII.  The submissions made by the appellant in writing, as
       far as they are relevant to this decision, may be
       summarized as follows:

*Article 83 EPC - Claims 14 to 17*

Claims 14 to 17 lacked an enabling disclosure. It was
not possible in a single sample from an individual
female to know what was "normal" for that individual
and whether the amount of DNA detected was lower or
higher than normal. The patent did not teach what was
meant by "normal". Moreover, it was apparent from
Figures 1 and 2 of the patent in suit that there was no
specific "normal" foetal DNA value for a pregnant woman.

As concerned the methods of claims 15 to 17, it was
suggested in documents (19), (26) and (23) published
after the priority date of the patent in suit that pre-
eclampsia or foetal chromosomal aneuploidy, in
particular trisomy 21, could not be detected using the
claimed methods. It was stated in document (19) - a
scientific publication co-authored by the inventors of
the patent in suit - that a method as claimed in
claim 1 "might" be suitable for the diagnosis of
aneuploidies, "if" there was a quantitative difference
in foetal DNA concentration in these conditions. It was
clear from this statement that, even after the priority
date, the inventors did not know whether or not Down's
syndrome could be diagnosed by their method. Thus, they
could not have been able to teach in the application as
filed how to perform such a diagnosis. The data in
Figure 1 of the patent merely confirmed that the method
could not be used for the diagnosis of aneuploidy.

As regards the diagnosis of pre-eclampsia, it was
concluded from the results of a much larger study
published in document (26) that the differences in
foetal DNA concentration between women suffering from
pre-eclampsia and control women were not statistically
significant. Furthermore, no correlation was found
between the quantity of foetal DNA and disease severity.

In document (23), the "considerable degree of overlap"
between foetal DNA concentrations in women carrying
trisomy 21 and euploid male foetuses was discussed. The
authors concluded that, due to the relatively low
sensitivity and specificity of the measurement of
circulating foetal DNA, a combination with other

markers for foetal trisomy 21 was needed. Additionally,
DNA markers that would identify female foetuses with
Down's syndrome were said to be needed, because at the
time only gene sequences from the Y chromosome were
used as basis of detection. It could be derived from
document (23) that only a very specific and unusual
trisomy originating in a chromosomal rearrangement of
paternal DNA would be detectable by the technique
disclosed in the patent. A classical trisomy comprising
a single additional whole chromosome would not be
detectable.

The suggestion in paragraph [0018] of the patent in
suit that the detection of trisomy 21 might be possible
by quantitating the relative amount of
chromosome 21 DNA compared to other foetal DNA appeared
extremely speculative. No proof had been provided that
either of the two ways suggested in the patent would
work. The statements in the patent were a mere "hope"
to succeed. Furthermore, in the case of a trisomy in
which two copies of the maternal chromosome 21 were
present, it would not be possible to use the
methodology of the patent to determine the ratio of
this chromosome to other foetal chromosomes, because
the total additional amount of chromosome 21 DNA in the
plasma was not detectable.

If there were serious doubts - supported by verifiable
facts - that the patent lacked an enabling disclosure,
the burden of proof should be placed on the patent
proprietor. In the present case, the post-published
documents (19), (26) and (23) indicated that it was not
possible to practice the invention claimed in claims 16
and 17 in the manner suggested in the patent for the

detection of trisomy. Moreover, there were technical
considerations suggesting that diagnosis of trisomy
would not be feasible from foetal DNA analysis alone.

*Article 87 EPC - Priority - Claims 14 to 17*

Claim 14 and claims 15 to 17 depending therefrom were
not entitled to the priority date and, consequently,
document (19) was prior art to be considered for the
assessment of inventive step.

Claim 14 related to a detection method in which the
level of foetal DNA in the maternal serum or plasma was
"higher or lower than normal". This meant that the
level of DNA had to be determined and compared to a
reference level, i.e. one which was normal. The
priority application did not teach this. On page 2,
lines 24 to 27 of the priority application it was
stated that the inventors claimed "detection and
monitoring of pregnancy-associated conditions such as
pre-eclampsia which may result in differing amounts of
foetal DNA being present in the maternal serum or
plasma". No reference standard for "differing" was
given. Since "differing" could be interpreted as
"differing over the course of time" or "differing from
an undefined threshold (as opposite to average)" or
even "differing from a previous pregnancy in the same
mother", the term could not be considered as a direct
and unambiguous disclosure of "differing from normal".

According to G 2/98 (OJ EPO 2001, 413), the test for
priority was a strict one. If, after the filing of the
priority application, a third party had filed an
application setting out the subject-matter of claim 15

or claim 16, those claims would clearly belong to that third party. For a valid priority, it was not enough to have a priority document containing a teaching which, on a possible construction, encompassed the subject-matter of a later claim.

*Article 56 EPC - Inventive step*

For the assessment whether or not the method of claim 1 involved an inventive step, there were two alternative approaches starting with two different strands of art. Both approaches were equally valid and led to the same conclusion, i.e. that claim 1 did not meet the requirements of Article 56 EPC.

In one approach, the relevant prior art was document (14) in the light of document (15). Document (14) related to the detection of foetal DNA sequences in the buffy coat fraction isolated from maternal peripheral blood. This fraction contained both foetal and maternal white blood cells. Document (15) taught that the DNA isolation technique described in document (14) presented a problem in the processing time and the use of caustic chemicals. It also taught that, instead of buffy coat, a serum or plasma sample could be used to determine HLA genotypes, using PCR amplification of DNA present in the sample. It was clear from this document as well as from documents (6), (11) and (10) that by 1997 the presence of DNA in circulating human blood was well established. It had also been recognised that this DNA originated from different cellular sources, including but not limited to peripheral blood cells. Accordingly, the skilled person reading document (15) in the light of

document (14) had every incentive to detect foetal DNA
sequences directly from plasma.

Moreover, he/she had more than a reasonable expectation
of success. This could be seen from document (13), in
which the isolation of foetal cells in maternal blood
for prenatal diagnosis was reviewed. The statements in
this document were consistent with the disclosure of
document (2). Thus, having regard to documents (14) and
(13), it would have been a surprise for a person
skilled in the art *not* to find foetal DNA in maternal
plasma.

An alternative and equally valid starting point for the
assessment of inventive step was to consider the prior
art relating to other forms of foetal cells in the
maternal circulation, particularly the trophoblast. At
the priority date it was known that migration of
trophoblastic cells into the maternal blood stream was
a normal process of pregnancy (see documents (1) and
(13)). The similarities between embryonic implantation
and tumour metastasis were discussed in document (9),
and in document (17) it was reported that DNA from
tumour cells was found in the plasma of cancer patients.

Starting from document (14), the problem to be solved
was to provide an alternative source of DNA to the
buffy coat fraction. In view of document (13), it was
an obvious alternative to isolate DNA from
trophoblastic cells present in maternal blood. Since
document (17) taught that cells with invasive
tendencies, of which trophoblasts were a well known
type, could be detected by analysis of plasma, it was

obvious to look at plasma in the expectation that it
would contain trophoblast DNA.

XIV.    The submissions made by the respondent, as far as they
        are relevant to this decision, may be summarized as
        follows:

        *Observations by an anonymous third party*

        The third party observations should be disregarded by
        the board since they were filed anonymously and at a
        very late stage of the proceedings.

        *Article 83 EPC - Claims 14 to 17*

        The requirement of Article 83 EPC was met in respect of
        claims 14 to 17 because the claimed invention could be
        reproduced and had been reproduced by those skilled in
        the art. It had not been demonstrated that the
        invention could not be carried out based on the
        teaching of the specification.

        By comparing the level of foetal nucleic acid in a
        sample taken from the mother to the level in samples
        taken previously from the same woman or, alternatively,
        to reference samples, a person skilled in the art could
        establish whether or not the level of foetal nucleic
        acid in a sample was lower or higher than normal.

        The documents cited by the appellant demonstrated that
        the methods claimed in claims 14 to 17 were useful in
        the diagnosis of aneuploidy and pre-eclampsia. The
        authors of document (26) established that the median
        SRY copy number was greater in women with pre-eclampsia,

C6855.D

and document (23) demonstrated that there were
detectable differences in the levels of foetal nucleic
acid in, e.g., pre-eclampsia and Down's syndrome. While
the latter document made reference to low sensitivity
and specificity for Down's syndrome, that did not mean
that the technique did not work, but merely that
further optimisation might be required in order to
enhance specificity and sensitivity. Document (23)
reported that an abnormally strong signal from DNA
sequences present on chromosome 21 was detected, which
was consistent with the fact that three copies of this
chromosome were carried by foetuses having Down's
syndrome.

*Article 87 EPC - Priority - Claims 14 to 17*

Claim 14 was entitled to priority because the priority
application taught detecting and monitoring pregnancy-
associated conditions such as pre-eclampsia which may
result in differing amounts of foetal nucleic acid
being present in the maternal serum or plasma. The
detection of pre-eclampsia, foetal chromosomal
aneuploidy and Down's syndrome was specifically
referred to in the priority document. Thus, also for
claims 15 to 17, the relevant date was the priority
date.

*Article 56 EPC - Inventive step*

Document (14), which could be regarded as the closest
prior art, described the extraction of nucleic acid
from the cellular fraction of maternal blood and its
subsequent analysis using the polymerase chain reaction
to detect foetal sequences. There was, however, no

C6855.D

suggestion that plasma or serum should or even could be
used for the detection of foetal sequences.

Even though the presence of circulating nucleic acid in
the serum or plasma of healthy patients had been known
for some years before the priority date, the source of
the nucleic acid had not been recognised. The fact that
a particular cell type was found to be circulating in
blood did not necessarily mean that also nucleic acid
from those cells would be present in blood in
detectable amounts. None of documents (6), (11) and (17)
showed that for any cells circulating in blood,
associated DNA could be found.

There was no evidence on file that the foetal cells
circulating in blood had the same properties as
maternal peripheral blood mononuclear cells. As
discussed in document (13), there were a number of
different foetal cell types circulating in maternal
blood. The fact that, at the priority date, nucleic
acid could be detected and analysed in serum or plasma
from healthy individuals did not provide any teaching
to assist one of skill in the art in establishing
whether foetal nucleic acid could also be detected in
maternal plasma or serum. Furthermore, it was neither
taught nor suggested in the documents on file that the
detection rate was much higher using serum or plasma
than using nucleated blood cells extracted from a
comparable volume of whole blood.

As concerned the appellant's second line of argument,
the relevant disclosure in document (13) was the
suggestion that trophoblasts circulating in maternal
blood could be isolated for subsequent analysis of

their nucleic acid. The problem to be solved could be
formulated as the provision of an alternative method
for the detection of foetal nucleic acid. The solution
provided in the patent was not obvious, either having
regard to document (13) alone or a combination of
documents (13) and (17). While document (9) suggested
that there were some similarities between tumour cells
and trophoblasts, the similarities related to enzymes
involved in invasion or implantation. Since there were
also many differences between trophoblasts and cancer
cells, it was not possible for one of skill in the art
to expect that any characteristic of cancer cells would
also be found for foetal cells.

Thus, the claimed methods involved an inventive step
within the meaning of Article 56 EPC. Documents (21),
(23), (24) and (25) demonstrated that the claimed
invention was considered to be a significant
development in the field.

XV.     The appellant (opponent) requested that the decision
        under appeal be set aside and that the patent be
        revoked.

XVI.    The respondent (patent proprietor) requested that the
        appeal be dismissed.

**Reasons for the Decision**

*Procedural issues*

1.      The opponent is the sole appellant against the
        interlocutory decision of the opposition division,
        which held that the patent could be maintained in

amended form on the basis of the claims according to
the auxiliary request 1 filed at the oral proceedings
and a description adapted thereto.

2.    The appellant contested the decision under appeal only
      in respect of the findings on sufficiency of disclosure
      (Article 83 EPC 1973), validity of the priority
      (Article 87 EPC 1973) and inventive step
      (Article 56 EPC 1973) concerning the set of claims
      according to auxiliary request 1. The appellant did not
      raise any objections to the opposition division's
      findings concerning Rule 57a and Articles 123(2)(3) and
      84 EPC 1973, and the board sees no reason to raise any
      objections of its own motion in this respect.

3.    Anonymous third party observations were received by the
      board at a very late stage, i.e. after the scheduled
      oral proceedings had already been cancelled in view of
      appellant's announcement not to attend these
      proceedings and the withdrawal of its subsidiary
      request for oral proceedings (see paragraphs VIII to X
      above). According to Rule 114(1) EPC, any observations
      by a third party shall be filed in writing. This
      requirement implies that the observations have to be
      signed (see Rules 50(3) and 86 EPC) in order to allow
      an identification of the third party (see Schachenmann
      in: Singer/Stauder, Europäisches Patentübereinkommen,
      5th ed., Art. 115 marg. no. 13). Identification is
      particularly important in the context of opposition
      proceedings in order to allow the competent organ of
      the EPO to verify whether the observations are indeed
      filed by a third party rather than by a party to the
      proceedings. Otherwise, a party might be tempted to
      submit late observations and/or documents by means of

anonymous third party observations in order to avoid
negative procedural consequences such as apportionment
of costs.

4.    When a party to the proceedings submits an unsigned
document, the document is deemed not to have been filed
if, after a corresponding invitation has been sent out
by the EPO, it is not signed in due time (see Rule 50(3)
EPC). Since unsigned anonymous third party observations
do not allow the EPO to send out such an invitation at
all, they necessarily remain unsigned. This has the
consequence that they are deemed not to have been filed.

5.    The board is aware that anonymously filed third party
observations may nevertheless be adopted by a party to
the proceedings as its own or may even trigger
objections by the competent organ of the EPO of its own
motion (see decision T 735/04 of 13 September 2007,
point 2 of the reasons, dealing with the exceptional
situation that a highly relevant patent application of
one of the patent proprietors had been submitted by an
anonymous third party). However, in the absence of such
a further procedural act, anonymous third party
observations are to be disregarded altogether. This
view is in line with the decisions G 1/03 and G 2/03
(OJ EPO 2004, 413 and 448) in which the Enlarged Board
of Appeal refused to take into account an anonymously
filed third party statement (see Section VI(3) of the
decisions).

6.    Thus, the anonymous observations under Article 115 EPC
received on 18 January 2011 are deemed not to have been
filed and are disregarded by the board.

*Sufficiency of disclosure (Article 83 EPC) - Claims 14 to 17*

7.    In the decision under appeal, the issue of sufficiency
      of disclosure was decided in connection with claims 1
      and 15 to 17 of the main request. Even though there is
      no explicit finding in the decision concerning the set
      of claims according to auxiliary request 1, the board
      infers from the opposition division's finding that the
      patent could be maintained on the basis of these claims,
      that the requirement of Article 83 EPC 1973 was
      considered to be met.

8.    In the reasons given for the decision on the main
      request, the opposition division regarded the results
      shown in Figures 1 and 2 of the patent in suit and in
      documents (30) and (31) as conclusive evidence that, in
      spite of the high number of false negatives and the low
      quality of the detection, the invention still allowed
      the detection of at least some pregnant females
      suffering from pre-eclampsia or carrying foetuses
      affected by chromosomal aneuploidy. Consequently, the
      opposition division decided that the methods of
      claims 15 to 17, as far as they concerned the detection
      of paternally inherited nucleic acid sequences which
      differed from the sequences of the corresponding
      maternal DNA, conformed to Article 83 EPC 1973.

9.    Claims 14 to 16 of auxiliary request 1 are - except for
      the amended dependencies - identical to claims 15 to 17
      of the main request. Thus, the opposition division's
      findings on the latter claims apply, *mutatis mutandis*,
      to the corresponding claims 14 to 16 of auxiliary
      request 1. In its statement of grounds of appeal, the
      appellant contended that the invention claimed in

claims 14 to 17 of auxiliary request 1 could not be
carried out by a person skilled in the art. The
appellant, however, did not submit any specific
counter-arguments against the reasons given by the
opposition division in connection with the main request.
Rather, as concerned claim 14 it argued that, since
there was no specific "normal" foetal DNA value for a
pregnant woman, it was impossible to determine what
constituted a value which was "higher than" or "lower
than" normal, as required in present claim 14 (see
paragraph XIII above).

10.    This argument fails to persuade the board. The fact
that no cut-off value for DNA in plasma or serum is
disclosed in the application as filed in connection
with the diagnosis of pre-eclampsia or the detection of
chromosomal aneuploidies - including trisomy 21 - does
not, in the board's view, mean that such a value cannot
be determined applying statistical methods which are
well-known in the field of diagnostic tests. A skilled
person working in this field at the relevant date knew
that "normal" or cut-off values for a particular marker
can be determined in large-scale studies comparing
affected and unaffected pregnancies, and that
statistical analysis of the data obtained may be
required. In its communication under Article 15(1) RPBA,
the board expressed the provisional view that the data
acquisition and analysis required for determining cut-
off values were routine work which would neither
require inventive skills nor put an undue burden on the
skilled person. No arguments or evidence which
contradict the board's view have been submitted by the
appellant.

11.   In its statement of grounds of appeal, the appellant
      pursued further the objection raised in opposition
      proceedings that the patent in suit did not teach a
      person skilled in the art how to perform the diagnosis
      of Down's syndrome. As evidence in support of this
      objection, the appellant relied on documents (19), (26)
      and (23), which were published after the priority date
      of the patent in suit.

12.   The board is unable to derive from document (19) any
      verifiable facts supporting the objection raised by the
      appellant. Contrary to the appellant's view, the
      statement made by the authors in the passage on
      page 487 of document (19) ("*... if there is a
      quantitative difference ...*") must not necessarily be
      understood as an expression of uncertainty. The board
      interprets this passage as generally pointing to the
      fact that quantitative differences are required in
      order for chromosomal aneuploidies to be detected.

13.   As concerns document (26), the board observes that the
      analysis described therein was carried out on the basis
      of the DNA extracted from maternal peripheral **blood**,
      which means that not only DNA in maternal plasma but
      also DNA from circulating foetal cells was determined.
      Thus, the analysis in document (26) is based on a
      method which is different from the method claimed in
      the patent and, consequently, any results obtained or
      any conclusions drawn from this analysis are not
      necessarily valid for the method of claim 15.
      Furthermore, the board observes that the conclusion
      drawn by the authors from the reported experiments
      points to a lack of correlation between the amount of
      DNA in peripheral blood and disease **severity**. This

cannot be considered as conclusive evidence that
detection of pre-eclampsia by analysis of the amount of
DNA in serum or plasma is not feasible.

14.    Finally, the statements in the passages of document (23)
on which the appellant relied in support for its
objection of lack of sufficient disclosure of the
methods according to claims 16 or 17, do not cast, in
the board's judgement, serious doubts concerning the
feasibility of the claimed method for detecting foetal
chromosomal aneuploidy, in particular Down's syndrome.
The passage on page 487 of document (23) to which the
appellant pointed (see paragraph bridging the left- and
right-hand columns) indicates that a better sensitivity
and specificity can be achieved by combining the
measurement of circulating foetal DNA with other
markers for foetal trisomy 21. This passage cannot, in
the board's view, be construed to mean that the methods
of the invention as such may not allow screening for
Down's syndrome.

15.    Moreover, contrary to the appellant's argument, there
is no statement in document (23) to the effect that
foetal genes suitable for screening female foetuses
have (yet) to be identified. Rather, the remark in the
last sentence of the paragraph is understood by the
board as indicating that, since gene sequences from the
Y chromosome were used as basis of detection at that
time, for female foetuses with Down's syndrome to be
identified applying a method as claimed, other DNA
markers must be used. See in this respect also the last
sentence under the heading "RESULTS" in the summary on
page 483 of document (23), stating that screening tests
for Down's syndrome, pre-eclampsia or preterm labour

"... *currently* rely on the detection of Y chromosomal
sequences and consequently are limited **presently** to
male fetuses" (emphasis in bold added by the board).

16.     For the reasons given above, documents (19), (26) and
        (23) cannot be regarded as conclusive evidence that the
        invention in claims 15 to 17 cannot be carried out by a
        person skilled in the art without an undue burden of
        experimentation.

17.     In its statement of grounds of appeal, the appellant
        admitted that two different methods of detecting Down's
        syndrome were suggested in the application as filed
        (see the passage on page 5, lines 3 to 26 of the
        application which corresponds to paragraph [0018] of
        the patent). Nevertheless, the appellant argued that in
        the absence of experimental evidence the burden of
        proof that either method worked must be shifted to the
        respondent.

18.     The board does not share this view. There is no
        evidence on file which supports the appellant's
        contention that a person skilled in the art applying
        either method suggested in the passage on page 5 of the
        application as filed would not be able to detect foetal
        chromosomal aneuploidies, in particular trisomy 21. The
        fact that in the documents cited by the
        appellant - which were published after the priority
        date of the patent in suit - the approaches suggested
        in the application as filed were not followed, does not
        necessarily mean that a person skilled in the art could
        not carry out the invention claimed in claim 17 using
        those methods. Since, in the board's judgement, the
        arguments put forward by the appellant either in

opposition or in appeal proceedings fail to raise
serious doubts as to the sufficiency of the disclosure
concerning the methods of claims 15 to 17, the burden
of proof is not shifted to the respondent, but rests
with the appellant.

19.    Having considered the arguments and evidence on file,
       the board concludes that the objection of lack of
       sufficient disclosure raised by the appellant is not
       justified.

*Article 87 EPC 1973 - Priority - Claims 14 to 17*

20.    In the decision under appeal, the opposition division
       found concerning the invention in claims 1, 12, 13
       and 14 that the priority claimed in the patent was
       valid and that, consequently, the relevant date for
       determining whether or not a document formed part of
       the state of the art within the meaning of
       Article 54(2) EPC 1973 was 4 March 1997.

21.    While the appellant did not contest the opposition
       division's findings on claims 1, 12 and 13, it disputed
       that the passage on page 2, lines 19 to 29 of the
       priority document described the same invention as in
       claim 14. In particular, it argued that the term
       "differing" could be interpreted in different manners
       and, therefore, could not be regarded as a clear and
       unambiguous disclosure of the feature "higher or lower
       than normal" in the context of claim 14 (see
       paragraph XIII above).

22.    The board does not share this view. Even though the
       term "differing" as such could in fact be given

different meanings, in the context of the passage on
page 2 of the priority application the sole possible
interpretation is "differing from the normal", which is
tantamount to "higher or lower than normal". It is
stated in the priority application that molecular
monitoring of an abnormal medical condition such as
pre-eclampsia, in which, as a result of placental
damage, alterations in foetal DNA concentration in
maternal serum and plasma are likely, could be
performed by accurate quantitation of foetal nucleic
acid levels in the maternal serum or plasma (see
paragraph bridging pages 5 and 6 of the priority
application). In the board's judgement, a person
skilled in the art reading this passage of the priority
application understands immediately that an **alteration**
of the foetal DNA level can only be determined by
comparison to the normal level, i.e. to the expected
level as determined by statistical analysis of normal
pregnancies. As stated by the opposition division in
its decision, it is not the quantification of a certain
parameter but rather the comparison to what is
considered "normal" that leads to a diagnosis (see
point 6.3 of the decision under appeal). This was
certainly within the general knowledge of the skilled
person at the relevant date.

23.    The board thus concludes that the invention in claim 14
       was disclosed in the priority application, and that the
       priority right in this respect has been validly claimed.

24.    Consequently, document (19) does not form part of the
       state of the art.

*Article 56 EPC - Inventive step*

25.    In the decision under appeal, the opposition division
       found that a skilled person, starting from document (14)
       as the closest prior art and confronted with the
       problem of providing a method for detecting foetal
       nucleic acids with higher sensitivity, would not derive
       the solution proposed in claim 1 from document (15).
       Consequently, the subject-matter of claim 1 was
       considered to involve an inventive step within the
       meaning of Article 56 EPC 1973.

26.    On appeal, the parties agreed that document (14), which
       describes a method for the detection of foetal RhD
       sequences in **peripheral blood** of sensitized RhD-
       negative pregnant women, represents the closest state
       of the art. In the method described in document (14),
       antecubital venous blood was collected from pregnant
       women and DNA was extracted from the buffy coat
       fraction. Foetal RhD sequences were detected by PCR
       using specific primers.

27.    In the view of the opposition division, the method
       described in document (14) differs from the method of
       claim 1 in that the presence of nucleic acid of foetal
       origin is detected in "buffy coat", i.e. peripheral
       blood mononuclear **cells** (PBMC) isolated from maternal
       peripheral blood, rather than in maternal serum or
       plasma as specified in claim 1. This finding was not
       contested by the appellant. In fact, for the isolation
       of PBMC as described in document (14), the plasma must
       be discarded.

C6855.D

28.    However, in its statement of grounds of appeal the
       appellant questioned the opposition division's findings
       as regards the technical problem to be solved. The
       appellant submitted that, having regard to
       document (14), the technical problem the skilled person
       was confronted with had to be formulated as providing
       an alternative source of foetal nucleic acid. In the
       appellant's view, the solution proposed in claim 1, i.e.
       the use of a maternal plasma or serum sample instead of
       buffy coat for the detection of foetal nucleic acid,
       was obvious to a person skilled in the art at the
       relevant date.

29.    The appellant put forward two alternative lines of
       argument. In its first line of argument, the appellant
       maintained that the drawbacks of the method described
       in document (14) - longer processing time and use of
       caustic chemicals - were apparent from document (15),
       in which the substitution of the buffy coat fraction
       with the plasma fraction was suggested. A person
       skilled in the art reading document (15) in the light
       of document (14) had, in the appellant's view, every
       incentive to detect foetal DNA sequences directly from
       plasma.

30.    The board disagrees with this view. As stated above,
       document (14) relates to a method in which a cellular
       fraction of maternal blood is analysed for foetal DNA.
       There is no suggestion in this document that foetal DNA
       can be detected in a maternal sample other than a
       cellular fraction. The sole suggestion provided in
       document (14) is to improve the accuracy of the assay
       by using specific foetal cell enrichment strategies,
       such as those for nucleated red cells or for

trophoblasts (see document (14), page 660, left column, last paragraph). Thus, a person skilled in the art reading this document had a motivation to use such enriched cellular fractions as an alternative source of foetal nucleic acid. A motivation to look for circulating, cell-free foetal nucleic acid in serum or plasma samples of maternal blood is, however, not apparent to the board.

31.    Document (15), on which the appellant further relied, relates to the analysis of circulating nucleic acid in serum or plasma. As the respondent argued, the fact that circulating nucleic acid is present in the blood of an individual had been known for many years before the relevant date of the patent. Although different sources of such circulating nucleic acid had been suggested in the literature (see documents (6), (11) and (17), there was no conclusive evidence as to where the nucleic acid originated. Neither was there an indication in the literature – at least not in any of the documents cited by the appellant – that circulating **foetal** nucleic acid might be present in maternal blood.

32.    Under these circumstances, the board judges that it would not have been obvious to a person skilled in the art, having regard to document (14), either alone or in combination with document (15), to try to detect a nucleic acid of foetal origin which is paternally inherited in maternal serum or plasma, as proposed in claim 1.

33.    In a second line of argument, the appellant contended that it was known in the art that DNA from cancer cells can be found circulating freely in the blood of cancer

patients - document (17) was cited as evidence in this
respect -, and that trophoblastic cells can be found in
maternal blood. In the appellant's view, the many close
analogies between tumour growth and trophoblast
invasion of the maternal uterus described in
document (9) would lead a person skilled in the art to
consider extending the analogy to the detection of DNA
in serum or plasma.

34.    In the board's judgement, the appellant's reasoning is
tainted by hindsight. Document (9) does not point to
any analogies whatsoever between tumour and trophoblast
cells, but rather to analogies between two **processes**:
on the one hand, the release of the unfertilized egg
from the ovary, the transport of the embryo through the
oviduct and uterus, and the implantation of the embryo;
and, on the other hand, tumour cell metastasis. Albeit
the authors of document (9) suggest that the enzymatic
and cellular machinery necessary for the two processes
may be related (see page 356, right column, first
paragraph under the heading "Relevance of Implantation
to Tumour Invasion and Metastasis"), the board
considers that a person skilled in the art would not
have drawn from this teaching the conclusion that
foetal nucleic acid can be detected in maternal serum
or plasma.

35.    Summarising the above: in view of the evidence and
arguments put forward by the appellant in its statement
of grounds of appeal, the board is not persuaded that
the method of claim 1 was obvious to a person skilled
in the art at the relevant date. The same applies to
the methods of claims 2 to 19. Thus, in the board's
judgement, the opposition division's finding that the

C6855.D

claimed subject-matter involves an inventive step within the meaning of Article 56 EPC is correct.

36.    Hence, none of the objections raised by the appellant prejudices the maintenance of the patent in amended form as decided by the opposition division.


**Order**


**For these reasons it is decided that:**


The appeal is dismissed.


The Registrar:                        The Chairman:




A. Wolinski                           R. Moufang

# United States Court of Appeals
# for the Federal Circuit

*Ariosa Diagnostics, Inc v. Sequenom, Inc.*
Nos. 2014-1139, -1144

## CERIFICATE OF COMPLIANCE

Counsel for Amicus Curiae BioIndustry Association hereby certifies that:

1.      The brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B)(i) because exclusive of the exempted portions it contain 2,442 words as counted by the word processing program used to prepare the brief; and

2.      The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2007 in a proportionally spaced typeface: Garamond, font size 14.

Dated:  August 27, 2015               /s/ Konstantin M. Linnik
                                      Konstantin M. Linnik

# United States Court of Appeals
## for the Federal Circuit
*Ariosa Diagnostics, Inc v. Sequenom, Inc.*
Nos. 2014-1139, -1144

### CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by NUTTER McCLENNEN & FISH LLP, counsel for Amicus Curiae, BioIndustry Association, to print this document. I am an employee of Counsel Press.

On **August 27, 2015**, Counsel for *Amicus Curiae* has authorized me to electronically file the foregoing **Brief of *Amicus Curiae*** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

David Isaac Gindler (Principal Counsel)
Andrei Iancu
Amir Naini
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
310-277-1010
dgindler@irell.com
aiancu@irell.com
anaini@irell.com
Counsel for Appellee
Ariosa Diagnostics, Inc.

William Paul Schuck
(Principal Counsel)
Bartko, Zankel, Bunzel & Miller
Suite 800
One Embarcadero Center
San Francisco, CA 94111
415-956-1900
pschuck@bzbm.com
Counsel for Appellee
Natera, Inc.

Michael J. Malecek  (Principal Counsel)
Peter E. Root
Aton Arbisser
KAYE SCHOLER LLP
Two Palo Alto Square, Suite 400
3000 El Camino Real
Palo Alto, California 94306
(650) 319-4500
michael.malecek@kayescholer.com
peter.root@kayescholer.com
aarbisser@kayescholer.com

Robert Barnes
KAYE SCHOLER LLP
1999 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
(310) 788-1000
robert.barnes@kayescholer.com
Counsel for Appellants
Sequenom, Inc., et al.

Thomas C. Goldstein
Eric F. Citron
GOLDSTEIN & RUSSELL, PC
7475 Wisconsin Avenue, Suite 850
Bethesda, MD 20814
(202) 362-0636
tg@goldsteinrussell.com
ecitron@goldsteinrussell.com
Counsel for Appellants
Sequenom, Inc., et al.

Any counsel for Amici Curiae who are registered users, at the time of filing, will also be served via e-mail notice from the Clerk of Court via the CM/ECF System.

Additionally, paper copies will also be mailed to the above principal counsel for the parties at the time paper copies are sent to the Court.

Sixteen paper copies will be filed with the Court within the time provided in the Court's rules.

August 27, 2015

/s/ Robyn Cocho
Robyn Cocho
Counsel Press

2868669.2